**UNITED STATES of America,
Plaintiff,**

v.

**Robert S. JONES, Defendant.**

**Case No. 3:16–cr–026**

United States District Court,
S.D. Ohio, Western Division,
**at Dayton.**

Signed February 1, 2017

Filed 02/02/2017

Alex R. Sistla, U.S. Department of Justice, United States Attorney's Office, Dayton, OH, Plaintiff.

Richard Edwin Mayhall, Flack & Mayhall, Springfield, OH, for Defendant.

**ENTRY AND ORDER DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS, DOC. 33, AND AMENDED MOTION TO SUPPRESS. DOC. 53. DEFENDANT'S REQUEST THAT THE COURT SUPPRESS EVIDENCE DERIVED FROM A NETWORK INVESTIGATIVE TECHNIQUE SEARCH WARRANT IS DENIED.**

THOMAS M. ROSE, UNITED STATES DISTRICT JUDGE

Pending before the Court are Defendant's Motion to Suppress, doc. 33, and Amended Motion to Suppress. Doc. 53. Therein, Defendant requests that the Court suppress evidence in this case derived from a network investigative technique, or NIT, search warrant, a subsequent search warrant to search Defendant's residence, and to suppress all statements made during Defendant's detention and arrest.

Defendant asserts that the network investigative technique search warrant was unconstitutional because the issuing court lacked jurisdiction to execute it and it violated Federal Rule of Criminal Procedure 41. One basis Defendant proposes for suppressing the subsequent search warrant of Defendant's residence is that it was based in part on evidence obtained by means of the network investigative technique warrant, and thus, fruit of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Plaintiff primarily relies upon the case of *United States v. Levin*, 186 F.Supp.3d 26 (D. Mass. 2016) to support his claim that the network investigative technique warrant was unconstitutional.

## I. Background

In January 2015, the FBI determined that a child pornography site operating on TOR ("the onion network") was hosted in North Carolina.[1] The out-of-district history of this case has been repeatedly described. In *United States v. Sullivan*, No. 1:16–CR–270, 2017 WL 201332 (N.D. Ohio Jan. 18, 2017), the court wrote:

On or about February 20, 2015, the government obtained an order from the Eastern District of Virginia allowing it to seize control of the operation of "Website A," which is also known as "Playpen." Website A contains various sections and forums related to child pornography. Website A requires users to install public[ ]ly available computer

---

**1.** For a thorough understanding of the technology at issue here, including the TOR software (which is used to conceal a user's IP address), NIT software (which is used by law enforcement to send instructions to a computer running TOR to reveal its true location), as well as the nature of the hidden or dark web (where websites like Website A operate in relative secrecy), see *United States v. Jean*, No. 5:15–CR–50087, 207 F.Supp.3d 920, 2016 WL 4771096 (W.D. Ark. Sept. 13, 2016); *United States v. Darby*, 190 F.Supp.3d 520 (E.D. Va. 2016).

software [called TOR or an "onion router"] before accessing the site. The software prevents someone attempting to monitor the internet connection from learning the user's physical location by routing communications through other locations. In this way, law enforcement cannot ascertain through public lookups the location of the users of Website A.

Pursuant to the Virginia warrant, the government was authorized to deploy a Network Investigative Technique ("NIT"). Each time a user logged onto Website A with a username and password, the FBI deployed the NIT which sent signals to the user's computer. Those communications were designed to cause the user's computer to deliver information to the government that identified the actual location of the user. The information included, among other things, the user's actual IP address. Id. at *1–2.

*Sullivan*, 2017 WL 201332 (quoting *United States v. Libbey–Tipton*, Case No. 1:16–CR–236, Doc. No. 19 (N.D. Ohio Oct. 19, 2016)).

As a result of deploying the NIT, law enforcement was able to determine that a user with the moniker "billypedo" had originally registered an account on Playpen on or about February 11, 2015. (Ex. B, Search Warrant and Application for 307 South Second Street (3:15–mj–270 (S.D. Ohio)) ("307 South Second Street Search Warrant"), ¶¶ 25–26.) According to data obtained from Playpen, "billypedo" logged onto Playpen multiple times between February 11 and March 2, 2015. (Id., ¶¶ 27–28.) The deployment of the NIT identified that the "billypedo" user accessed Playpen from IP address 71.67.116.75 on February 26, 2015 and viewed several files containing child pornography. (Id.)

In addition to obtaining the IP address from which "billypedo" accessed Playpen, law enforcement also learned the "name"

and "logon" of the computer "billypedo" used to access the site on February 26, 2015. (Id., ¶ 29.) Law enforcement ultimately determined that the above IP address was operated by Time Warner Cable. Information received from Time Warner showed that Jones was the subscriber associated with the IP address, and that his account was activated in July 2014, remained active as of March 3, 2015, and was tied to an address in Sidney, Ohio. (Id., ¶ 30.)

The FBI subsequently learned that Jones was a registered sex offender based on an earlier 2003 adjudication in Illinois. (Id., ¶ 32.) Jones' sex registration paperwork indicated that he had lived from August 2014 until June 2015 at the same Sidney, Ohio address as was listed in the Time Warner records, but was now residing on South Second Street in Anna, Ohio. (Id., ¶¶ 32–33.)

Based on the foregoing, on August 21, 2015, the FBI executed a search warrant at Jones' South Second Street residence. The FBI seized multiple pieces of electronic media that day containing over 2,300 images of child pornography. Jones and his then fiancée were present during the search warrant. (Id., ¶¶ 54–55.) Jones' fiancée confirmed that they obtained Internet service through Time Warner, and that they had previously lived in Sidney, Ohio. (Id., ¶ 55.)

On February 25, 2016, a federal grand jury in the Southern District of Ohio returned an indictment charging Jones with two counts of coercion and enticement of a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b) (Counts 1 & 4), six counts of production or attempted production of child pornography, in violation of 18 U.S.C. § 2251(a) & (e) (Counts 2, 3, 5, 7, 8, 9), one count of receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2) & (b)(1) (Count 6), one count

of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) & (b)(2) (Count 10), and one count of committing a felony offense involving a minor while being required by federal or other law to register as a sex offender, in violation 18 U.S.C. § 2260A (Count 11). (R. 20, Indictment, 79–88.) Defendant has moved the Court to suppress the fruits of the search of his residence.

## II. Analysis

An analysis of whether the issuing magistrate of the NIT warrant begins with the Federal Magistrates Act, under which:

Each United States magistrate judge serving under [the Act] shall have within the district in which sessions are held by the court that appointed the magistrate judge, at other places where that court may function, and elsewhere as authorized by law—

> (1) all powers and duties conferred or imposed...by the Rules of Criminal Procedure for the United States District Courts[.]

28 U.S.C. § 636(a)(1).

Primary to our purposes, Rule 41(b) of the Federal Rules of Criminal Procedure grants a federal magistrate judge authority to issue warrants "to search for and seize" persons and property *within* the district in which the magistrate sits. Now and at the time the NIT warrant issued, Rule 41(b) sets forth specific instances when a magistrate judge may issue a warrant for persons or property that may be located, or travel, *outside* the magistrate's judicial district. Included in this is authority for a magistrate judge to issue a warrant to install within the district a "tracking device" so that law enforcement can track the movement of persons and property within and outside the judicial district.

Additionally, effective December 1, 2016, Rule 41(b) was amended to add another exception to the requirement that the property to be searched and the persons to be seized be found in the magistrate judge's district. Subsection 41(b)(6)(A), now provides:

> a magistrate judge with authority in any district where activities related to a crime may have occurred has authority to issue a warrant to use remote access to search electronic storage media and to seize or copy electronically stored information located within or outside that district if...the district where the media or information is located has been concealed through technological means....

Courts that have addressed the NIT warrant have reached a variety of conclusions on the legality of the NIT warrant. Numerous courts have determined that the magistrate judge possessed adequate authority to issue the NIT warrant under Rule 41(b), such that there was no legal violation that would require suppression. *See United States v. Sullivan*, No. 1:16–CR–270, 2017 WL 201332, at *8 (N.D. Ohio Jan. 18, 2017)(gathering cases).

The vast majority of courts have found that, while the NIT warrant may have been issued unlawfully, suppression was not warranted, either under the exclusionary rule in general, or pursuant to the good faith exception set forth in *United States v. Leon*, 468 U.S. 897, 920, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). *Id.*

Four cases, including *United States v. Levin*, 186 F.Supp.3d 26 (D. Mass. 2016), have concluded that the NIT warrant was unlawfully issued and suppressed all fruits of it. *Id.* Relying primarily on the *Levin* decision, Defendant urges the Court to join the minority of courts that have concluded that suppression of all evidence flowing from the execution of the network investigative technique warrant is necessary.

 The network investigative technique is akin to a pen register to collect dialed telephone numbers, which the Supreme Court has found constitutional even when Rule 41 did not specifically include electronic intrusions in its definition of property. See *United States v. N.Y. Tele. Co.*, 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977). Rule 41 "is sufficiently flexible to include within its scope electronic intrusions authorized upon a finding of probable cause." Id. at 169, 98 S.Ct. 364 & n.16. Similarly, the Ninth Circuit upheld a warrant allowing video surveillance despite Rule 41's silence on this type of warrant. See *United States v. Koyomejian*, 970 F.2d 536, 542 (9th Cir. 1992) (en banc). Thus, Rule 41 has been found flexible enough to accommodate advancements in technology not envisioned when the rule was promulgated. *United States v. Sullivan*, 2017 WL 201332, at *4.

Rule 41(b)(1) permits a warrant for a search within the issuing magistrate judge's district. Rule 41(b)(4) allows magistrate judges to issue warrants for "tracking devices" that are installed within the district. Defendant argues that Rule 41(b)(1) cannot apply because neither he nor his computer ever physically entered the Eastern District of Virginia. Likewise, agents monitoring the website never physically left the Eastern District of Virginia.

The Court finds persuasive guidance from courts that have determined that the search actually took place in Virginia. *United States v. Darby*, 190 F.Supp.3d 520 (E.D. Va. 2016), reasoned that "[u]sers of [Website A] digitally touched down in the Eastern District of Virginia when they logged onto the site." *Darby*, 190 F.Supp.3d at 537. When they logged on, government code caused their home computers, which may have been outside of the district, to send information about their location. Id. Other courts have similarly concluded that the activating computers

digitally entered the Eastern District of Virginia when they logged into the website. See *Jean*, 207 F.Supp.3d at 940, 2016 WL 4771096, at *15 ("whenever someone entered [Website A] he or she made a 'virtual trip' via the Internet to Virginia, just as a person logging into a foreign website containing child pornography makes a 'virtual trip' overseas") (quoting *United States v. Matish*, 193 F.Supp.3d 585, 613 (E.D. Va. 2016)) and *United States v. Sullivan*, 2017 WL 201332, at *5.

Once a visitor logged onto the website in Virginia and downloaded pornography, NIT was deployed and identifying information was sent by the user's computer. Thus, NIT operated as a virtual tracking device. One court explained the entire process as such:

> [The defendant] took a virtual trip to the Eastern District of Virginia, but rather than travel by car, he traveled digitally—his vehicle was comprised of packets of information. Once there, the FBI attached a digital electronic tracking device to those packets, which [the defendant] virtually rode back to the Northern District of West Virginia. Upon his virtual return, [the defendant] parked his digital vehicle built of those packets of information on his computer, rather than in his driveway. At that point, the NIT sent back his digital address, just as a GPS tracker would send back his coordinates.

*United States v. Lough*, 221 F.Supp.3d 770, 778–79, 2016 WL 6834003, at *6 (N.D.W.Va. 2016); see *Jean*, 207 F.Supp.3d at 940, 2016 WL 4771096, at *15 ("the installation [of a tracking device by the FBI] did not occur on the government-controlled computer but on each individual computer that entered the Eastern District of Virginia when its user logged onto Playpen via the TOR network"). "When the computer left Virginia—when the user

logged out of [Website A]—the NIT worked to determine its location, just as traditional tracking devices inform law enforcement of a target's location." *Jean*, 207 F.Supp.3d at 940, 2016 WL 4771096, at *15 (quoting *Matish*, 193 F.Supp.3d at 613).

Some courts have rejected the idea conceptualizing the NIT as obtaining the website user's IP address by tracking data, seeing it instead as searching the user's computer. See *United States v. Workman*, 205 F.Supp.3d 1256, 1262–63, 2016 WL 5791209, at *4 (D. Colo. 2016) ("The government did not obtain [defendant's] IP address by tracking the data as it moved through various relay nodes back to [defendant's] computer. Rather the government, through the NIT, searched [defendant's] computer and seized his IP address along with various other pieces of information."); see also *United States v. Adams*, 2016 WL 4212079, at *6 (M.D. Fla. 2016) ("the NIT does not track; it searches"). This analysis, however, fails to appreciate the realities that what is being tracked is the information as it travels from the website to the user's computer through the computer's code. See *Sullivan*, 2017 WL 201332, at *6. That the information comes to rest with the user and his computer does not change the nature of tracking that takes place. *Id.* Like a traditional tracking device that sends back a location identifying signal, the NIT causes the computer to send back the location identifying information. "The fact that the NIT was purposely designed to allow the FBI to electronically trace the activating computer by causing it to return locating identifying information from outside the Eastern District of Virginia—is not only authorized by Rule 41(b)(4), but is the very purpose intended by the exception." Id. (quoting *Jean*, 207 F.Supp.3d at 942–43, 2016 WL 4771096, at *17).

That Rule 41(b) has been amended to include language allowing for a warrant in situations where a suspect is using encryption software to conceal or mask his location does not necessarily mean that the rule as it existed in 2015 did not allow the NIT warrant. Defendant voluntarily and deliberately came to the Eastern District of Virginia when he took affirmative steps to log into the Playpen website by entering a username and password. The NIT software could not have been deployed if Defendant had not made this virtual trip. See *Lough*, 221 F.Supp.3d at 778, 2016 WL 6834003, at *6 ("the server did not reach out to him unsolicited") (citation omitted); *Jean*, 207 F.Supp.3d at 943, 2016 WL 4771096, at *17 ("It is also undisputed that but for Mr. Jean electronically traveling in search of child pornography to the watering hole in Virginia, the NIT could not have been deployed.") (emphasis in original). Once virtually in the Eastern District of Virginia, the NIT was embedded in the material Defendant was downloading and he carried it back to Ohio much like he would have carried a tracking device attached to his car. Once deployed, the NIT functioned in much the same way as a traditional tracking device sending location information back to the agents. See *Sullivan*, 2017 WL 201332, at *6. The language of Rule 41(b)(4) as it was at the time of the NIT warrant was flexible enough to support such an investigatory technique.

 Even if the NIT warrant violated Rule 41(b), any alleged violation would not cause this Court to utilize the exclusionary rule. While the Fourth Amendment protects against unreasonable searches and seizures, it does not contain an enforcement mechanism. The exclusionary rule is a "judicial innovation," *United States v. Clariot*, 655 F.3d 550, 553 (6th Cir. 2011), designed to discourage the police from violating the Fourth Amendment. *Davis v. United States*, 564 U.S. 229, 236, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011) ("The rule's

sole purpose...is to deter future Fourth Amendment violations.") (collecting cases); *see United States v. Leon*, 468 U.S. 897, 916, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (the exclusionary rule is a judicially created remedy which safeguards individual 4th Amendment rights by deterring police misconduct). It does not address the conduct of federal judges. *See Leon*, 468 U.S. at 916, 104 S.Ct. 3405 ("To the extent that proponents of exclusion rely on its behavioral effects on judges and magistrates...their reliance is misplaced...the exclusionary rule is designed to deter police misconduct rather than punish the errors of judges and magistrates."); *United States v. Master*, 614 F.3d 236, 242 (6th Cir. 2010) (The exclusionary rule is designed "to curb police rather than judicial misconduct.") (quotation marks and citation omitted). Neither is the rule's purpose to remedy individual privacy violations. *Calandra*, 414 U.S. at 347, 94 S.Ct. 613 ("The purpose of the exclusionary rule is not to redress the injury to the privacy of the search victim[.]"); *see Davis*, 564 U.S. at 236, 131 S.Ct. 2419 (citing, *inter alia*, *Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976)).

▮ Because operation of the rule carries the heavy societal cost of suppressing otherwise reliable evidence of unlawful behavior, it is not "an automatic consequence of a Fourth Amendment violation." *Herring v. United States*, 555 U.S. 135, 136, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009); *see Davis*, 564 U.S. at 237, 131 S.Ct. 2419 (noting that application of the rule "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence" (citation omitted); *Hudson v. Mich.*, 547 U.S. 586, 591, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) (noting that exclusion is a "last resort, not a first impulse"). Instead, in order for the exclusionary rule to take root, "the deterrence benefits of

suppression must outweigh its heavy costs." *Davis*, 564 U.S. at 237, 131 S.Ct. 2419 (citation omitted). Thus, operation of the exclusionary rule is limited "to situations in which [the purpose of deterring future Fourth Amendment violations] is 'thought most efficaciously served." *Id.* at 237, 131 S.Ct. 2419 (citation omitted). "Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly...unwarranted.'" *Id.* (quoting *United States v. Janis*, 428 U.S. 433, 454, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976)).

▮ The good-faith exception to the exclusionary rule announced in *Leon* recognizes the balance between enforcement of the Fourth Amendment and society's interest in punishing criminal conduct. See *Davis*, 564 U.S. at 238–39, 131 S.Ct. 2419. "The basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." Id. at 238, 131 S.Ct. 2419 (quoting *Herring*, 555 U.S. at 143, 129 S.Ct. 695). Where "the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, or when their conduct involves only simple, 'isolated' negligence[,]" the high cost of suppression outweighs its deterrent benefit. *Id.* (quoting *Leon*, 468 U.S. at 909, 104 S.Ct. 3405; *Herring*, 555 U.S. at 137, 129 S.Ct. 695). "[T]he crucial finding needed to suppress evidence is whether 'police [mis-]conduct [is] sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.'" *Master*, 614 F.3d at 243 (quoting *Herring*, 129 S.Ct. at 702).

Relying primarily upon the Massachusetts decision in *Levin*, Defendant argues that the good-faith exception finds no application in the present case because the magistrate judge exceeded her jurisdiction, rendering the warrant void *ab initio*.

(Amended Mot. at PageId 746–49 (citing, among authority, *Levin*, 186 F.Supp.3d at 41.) Defendant's argument is foreclosed by the Sixth Circuit's decision in *Masters*. In *Masters*, a search warrant was issued by a state judge who lacked the authority to do so under state law (the judge sat in one county and the warrant was executed in another). Notwithstanding the fact that the warrant was void *ab initio*, the court ruled that in light of recent Supreme Court precedent, including *Herring*, the legal status of the warrant merely informed but did not control the good faith analysis. *Masters*, 614 F.3d at 243. The ruling in *Masters* was effectively at odds with an earlier Sixth Circuit decision in which the *Leon* good faith balancing test was rejected because the warrant in question had been issued by someone who lacked the legal authority to issue it. Id. at 241–42 (citing *United States v. Scott*, 260 F.3d 512, 515 (6th Cir. 2001)). The court in *Masters* concluded, "[w]e do not believe, however, that such a broad interpretation of *Scott* continues to be viable in light of more recent Supreme Court cases." *Id.* at 242 (citing, among authority, *Herring*, supra). Courts within the Sixth Circuit, like *Ammons*, have held that the decision in *Masters* compels the conclusion that the *Leon* good faith analysis still applies, even if the NIT warrant is void *ab initio*. *United States v. Ammons*, 207 F.Supp.3d 732, 743-44, 2016 WL 4926438, at *8 (W.D. Ky. 2016); see also *United States v. Scarbrough*, 2016 WL 5900152, at *1 (E.D. Tenn. 2016) (rejecting defendant's suggestion that it "reexamine" *Masters*, noting that "[t]his court does not 'reexamine' Sixth Circuit precedent. Instead, this court follows it.") (emphasis in original).

Applying the balancing test required by Supreme Court and Sixth Circuit precedent, the Court finds that, even if the magistrate judge exceeded her jurisdiction, suppression is not warranted because the record demonstrates that the FBI agents in the Eastern District of Virginia acted with good faith by diligently gathering information before submitting a detailed affidavit that fully apprised the issuing magistrate judge of all aspects of the NIT process, including the fact that the server for Website A would, at all times, be located in the Eastern District of Virginia, while the activating computers may be located outside the district. See *Ammons*, 207 F.Supp.3d at 744–45, 2016 WL 4926438, at *9; *United States v. Werdene*, 188 F.Supp.3d 431, 453 (E.D. Pa. 2016) (The FBI agents "provided the magistrate with all the information she needed to satisfy [herself] of [her] jurisdiction before proceeding.") (quotation marks and citation omitted). "The FBI agents can hardly be faulted for failing 'to understand the intricacies of the jurisdiction of federal magistrates.'" *Ammons*, 207 F.Supp.3d at 745, 2016 WL 4926438, at *9 (quoting *Darby*, 190 F.Supp.3d at 539).

▆▆ The only possible benefit to be achieved by suppression if the magistrate judge had acted without authority and violated Rule 41(b), would be to deter future magistrate judges from making the same mistake. Yet, as of December 1, 2016, Rule 41(b) expressly provides for the type of warrant that is at issue in this case. See Fed. R. Civ. P. 41(b)(6). Moreover, the exclusionary rule is directed to controlling the conduct of law enforcement and not the conduct of members of the judiciary. See, e.g., *United States v. Broy*, 209 F.Supp.3d 1045, 1058–59, 2016 WL 5172853, at *9 (CD. Ill. 2016) (noting both that the then-anticipated amendment to Rule 41 means that the deterrent effect on law enforcement would be "short lived," and also underscoring the fact that the "exclusionary rule is designed to control the conduct of law enforcement, not the conduct of federal judges")(citing *Leon*, 468 U.S. at 906–08, 104 S.Ct. 3405) (em-

phasis in original). Suppression to punish or deter future magistrate judges would represent a misuse of the exclusionary rule. *United States v. Sullivan*, 2017 WL 201332, at *8 (N.D. Ohio Jan. 18, 2017). In the absence of any evidence that suppression would serve any legitimate deterrent effect on law enforcement, the good faith exception to the exclusionary rule would apply, and suppression would not be an appropriate remedy in this case

### III. Conclusion

Thus, even assuming a search occurred, and further assuming the magistrate judge did not have authority under Federal Rule of Criminal Procedure 41(b) to issue the warrant (which she did); the evidence should not be suppressed under *Leon's* good faith exception. Defendant's Motion to Suppress, doc. 33, and Amended Motion to Suppress, Doc. 53, are **DENIED IN PART**. Evidence in this case derived from the network investigative technique search warrant will be admissible, and, as such, the fruit of the poisonous tree doctrine does not apply.

To the extent Defendant seeks to suppress evidence of statements made at his residence as involuntary or in violation of *Miranda*, a hearing will be held.

**DONE** and **ORDERED** in Dayton, Ohio on Wednesday, February 1, 2017.